# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**GARY TODD SMITH,**

    **Petitioner,**

**v.**                         **Case No.: 8:22-cv-2251-CEH-TGW**
                                  **Crim. Case No. 8:16-cr-120-CEH-TGW**

**UNITED STATES OF AMERICA,**

    **Respondent.**

_____/

### ORDER

Before the Court is Gary Todd Smith's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 (Doc. 1) and corrected memorandum in support (Doc. 5). The United States filed a response in opposition with an affidavit and exhibits. (Doc. 12). Smith filed a reply. (Doc. 15). At this Court's direction, the United States filed a supplemental response, an affidavit, and exhibits. (Doc. 17). With leave of Court, Smith filed a supplemental reply with exhibits. (Doc. 18). Smith is not entitled to relief because his claims lack merit.[1]

---

[1] The motion can be denied without need for an evidentiary hearing, as no hearing is required when the record establishes that a Section 2255 claim lacks merit. *See United States v. Lagrone*, 727 F.2d 1037, 1038 (11th Cir. 1984).

## I.    Background

On June 7, 2017, Smith pleaded guilty—without a written plea agreement—to conspiring to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; and wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343. (Cr-Doc. 18).[2]

## II.    Statement of Facts and Procedural History

From 2005 to 2012, Smith was the Chief Operating Officer of Smith Advertising and Associates, Inc. *See United States v. Smith*, 853 F. App'x 589, 590 (11th Cir. 2021). To cover up the corporation's losses, Smith orchestrated a complicated loan-fraud scheme involving invoice-factoring fraud and bridge-loan fraud that caused tens of millions in losses to the victim lenders. *Id.* When Smith became the subject of a federal investigation in April 2012, he hired attorney James E. Felman ("Felman") to represent him. (*See* Doc. 12, Attachment 1 (Felman Affidavit), at 2).

On May 5, 2012, Smith was arrested on a criminal complaint for wire fraud affecting a financial institution (Cr-Doc. 1). Because of prolonged negotiations, the parties filed three joint motions to extend the United States' deadline to indict Smith (Cr-Docs. 11, 14, 16). On August 20, 2014, Felman emailed Smith a proposed plea agreement from the United States.

---

[2]  References to filings in criminal case number 8:16-cr-120-CEH-TGW are cited as "Cr-Doc. [document number]."

On Aug 20, 2014 3:25 PM, "Jim Felman" <JFelman@kmf-law.com> wrote:
Hi Todd -- please find attached the proposed plea agreement I received today from Tom Palermo.  Please give me a call once you have had an opportunity to review it.  Thanks, Jim.

James E. Felman

(Doc. 12, Attachment 2 at 27); Attachment 1 at 2).

Felman states in an affidavit that he "spoke to Mr. Smith on the telephone the same day that [he] sent him the plea agreement" and "explained the proposed agreement to Mr. Smith, and particularly that it contained a 20-year 'cap' on any sentence of imprisonment even if the range of imprisonment under the Sentencing Guidelines range exceeded 20 years." (Doc. 17, Attachment 1 ¶ 7; *see also* Attachment 3 (billing for "Telephone conference with client")).

Smith responded to Felman's email the next day:

I realize you have a busy day, so please do not feel that you need to respond.

I am struggling with where we landed on the plea deal. I gave all that I could to include doing the work for the Government and paying for it on the forensic accounting. I think you did everything humanly possible. In return, we receive a plea deal that offers very little.

Although Tom and Bob may consider this, I doubt it will be much, as they have all the leverage.

If I go with the court appointed attorney or public defender and force them to indict me, can I pursue a trial? Would the track of going to trial give me discovery which buys more time, allows us to see exactly what they have, and actually makes them have to work. Does it offer more time. I assume I can always still plea at the end[,] and could it get worse than where we are now? Does the prospect of having to go to trial motivate them for a better deal? If not, do we have much to lose?

(Doc. 12, Attachment 2 at 27). Felman replied, "I will give you a call re this sometime this Afternoon . . .." (*Id.*).

3

Felman states in his affidavit that he spoke with Smith on the telephone, again, on August 21, 2014. (Doc. 17, Attachment 1 ¶ 9; *see also* Attachment 3 (billing for "Telephone conference with client"). Felman states that during this conversation, he "again discussed the terms of the proposed plea agreement with Mr. Smith, and answered any questions he had for me about it." (Doc. 17, Attachment 1 ¶ 9.) According to Felman, Smith "ultimately decided not to accept the plea offer." (*Id.*) Along with his affidavit, in which he describes his conversations with Smith about the plea agreement, Felman also provided an invoice that memorializes that he reviewed and analyzed the plea agreement, had a telephone conference with the Assistant United States Attorney, and one with Smith. (Doc. 17, Attachment 3 at 1).

There was no activity in the criminal case from August 7, 2014, until March 16, 2016, when a grand jury indicted Smith on the charges of conspiring to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, and wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343. (Cr-Doc. 18). After these charges were filed, Felman stopped representing Smith. (Doc. 12, Attachment 1 at 2). Smith asserts that this was due to his exhaustion of available funds to pay for his services. (Doc. 15 at 3–4, 6). Smith then emailed Felman, stating, in part:

> Jim, first, thank you for all that you did to defend me. You are a good man. Obviously, not having the funds to pay you, moving forward, has been a tough blow to me. Friday was a horrible day receiving the news. I am thankful for all of your hard work. If nothing else[,] I have had time with my family and two boys. . . . I can only pray that my boys can get further into high school before my situation comes to a head.

(Doc. 12, Attachment 2 at 30).

4

Smith appeared pro se at his arraignment on April 19, 2016, and the magistrate judge appointed attorney Robert Tager ("Tager") to represent him. (Cr-Docs. 27, 29). Smith pleaded not guilty. (Cr-Doc. 29). But on June 6, 2017—two weeks before trial—Smith entered an open guilty plea on both counts of the indictment. (Cr-Docs. 49, 50). At the open guilty plea hearing, the magistrate judge asked the parties whether there had been a plea agreement:

> THE COURT: Was there a plea agreement proffered in this case?
>
> [AUSA]: No. We had discussed many years ago with his original – first counsel representing Mr. Smith the potential of a plea agreement, but I don't believe we ever formally tendered one. We could not come to terms in terms of what offer might be made by the government.
>
> THE COURT: Okay. Mr. Tager, is that correct?
>
> THE DEFENDANT: I don't think there's ever been a plea agreement, Your Honor.
>
> THE COURT: Okay. So typically if one was offered, I'd want to know whether the Defendant was aware of it and why he didn't want it, but if there wasn't even one.
>
> [AUSA]: We discussed it. We discussed the possibility of a plea agreement, but it was always a theoretical discussion and never went into a document.
>
> THE COURT: Okay. Do you understand – Mr. Smith, just so you know that any determination whether they have a plea agreement, assuming one was ever offered, is your decision to make, not your lawyers? Do you understand that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: And do you still wish to go forward without a plea agreement?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Are you pleading guilty freely and voluntarily?
>
> THE DEFENDANT: Yes, Your Honor.

(Cr-Doc. 63 at 28–30). The magistrate judge then found that Smith's guilty plea to the charges was knowing and voluntary, that he understood the charges, the penalties, and the consequences of pleading guilty, and that there was a factual basis for the guilty plea. (Cr-Doc. 63 at 37; Cr-Doc. 61).

The then-assigned District Judge, Elizabeth A. Kovachevich, later accepted Smith's guilty pleas and adjudicated him guilty (Cr-Doc. 62). In December 2018, after a five-day comprehensive hearing to identify the victims' losses and total restitution, the court sentenced Smith to 480 months imprisonment and ordered him to pay $63,491,769.08 in restitution (Cr-Doc. 173; *see also* Cr-Docs. 203, 204, 208–210).

Smith appealed, arguing that the court incorrectly applied several sentencing guideline enhancements; erred in determining the loss amounts for purposes of sentencing and restitution; and that the court imposed a procedurally and substantively unreasonable sentence. *United States v. Smith*, 853 F. App'x 589 (11th Cir.), *cert. denied*, 142 S. Ct. 291 (2021). The Eleventh Circuit rejected the arguments and affirmed Smith's convictions and sentence. *Id.*

Now, Smith raises two interrelated grounds for relief under 28 U.S.C. § 2255 through new counsel: (1) that his original counsel, Felman, rendered ineffective assistance in failing to advise him of a plea agreement and discuss it with him (Ground One) and (2) that his guilty pleas were involuntarily entered because of the alleged ineffective assistance by Felman (Ground Two). Smith alleges he "was not aware, at the time he entered the open guilty pleas, that a favorable plea agreement had been available to him." (Doc. 1 at 5). He acknowledges, however, that he received an

6

unexecuted draft plea agreement by email from Felman, (*see id.* (stating that he "previously believed that his initial counsel had forwarded him an email with a plea agreement attached")) but claims that "[n]either his initial counsel [Felman] nor his successor counsel ever discussed the plea agreement with him" (*id.*). Smith then contradicts himself by stating that it was not until after his direct appeal had been filed that he "realized the existence of the plea agreement that his counsel had never discussed with him" (*id.* at 6).

The United States admits that Smith's motion was timely filed under 28 U.S.C. § 2255(f) and presents cognizable claims but argues that the claims are meritless. (*See* Doc. 12 at 6–11). The Court agrees.

## III.    Discussion

### *Ground One: Ineffective Assistance of Counsel*

A petitioner must meet a stringent, two-prong test to succeed on an ineffective assistance of counsel claim. First, the petitioner must show that counsel committed "errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, the petitioner must prove resulting prejudice. *Id. Strickland* sets a "high bar" for ineffective assistance claims; surmounting it "is never easy." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks and citation omitted). The petitioner's claim fails if he fails to establish either of the *Strickland* prongs. *See Maharaj v. Sec'y, Dep't of Corr.*, 432 F.3d 1292, 1319 (11th Cir. 2005).

When evaluating performance, this Court must apply a "strong presumption" that counsel has "rendered adequate assistance and [has] made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. To establish deficient performance, a petitioner must show that "no competent counsel would have taken the action his counsel did take." *See Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (en banc). The standard that the petitioner must meet is both "rigorous" and "highly demanding," and requires showing "gross incompetence" on counsel's part. *Kimmelman v. Morrison*, 477 U.S. 365, 381–82 (1986). A petitioner establishes prejudice only when he establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

Defendants have the right to the effective assistance of competent counsel during plea negotiations, and the *Strickland* test applies to claims of ineffective assistance regarding plea offers. *Missouri v. Frye*, 132 S. Ct. 1399, 1409–10 (2012). "As a general rule, defense counsel has a duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 132 S. Ct. at 1408; *see also*, *Johnson v. Duckworth*, 793 F.2d 898, 902 (7th Cir.), *cert denied*, 479 U.S. 937, 107 S.Ct. 416, 931 L.Ed.2d 367 (1986) ("attorneys have a duty to inform their clients of plea agreements proffered by the prosecution, and that failure to do so constitutes ineffective assistance of counsel under the Sixth and Fourteenth Amendments). Moreover, the duty to communicate formal plea offers

includes a "critical obligation . . . to advise the client of the advantages and disadvantages of a plea agreement." *Padilla v. Kentucky*, 559 U.S. 356, 370 (2010). "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial." *Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984) (per curiam); *Downs–Morgan v. United States*, 765 F.2d 1534, 1539 (11th Cir. 1985).

Smith alleges he "did not have any reason to believe that a plea agreement was ever offered," and therefore, Felman rendered deficient performance to him. (Doc. 1 at 4). At the same time, Smith acknowledges that he had "previously believed that his initial counsel [Felman] had forwarded him an email with the plea agreement attached." (*See* Doc. 1 at 5). Next, he asserts that he "was not aware a favorable plea agreement had been available to him." (*Id.*).

It is clear from the record that Smith received a copy of a plea agreement in an email from Felman, and he responded the next day, expressing his frustration. However, in response to the magistrate judge asking during the plea hearing if a plea agreement had been proffered, Smith stated, "I don't think there's ever been a plea agreement, Your Honor." (Cr-Doc. 63 at 28–30). He claims his response resulted from confusion over statements made by his successor counsel, Tager, and an Assistant United States Attorney. He asserts that Tager advised him that "no plea agreement would be offered" and that "[t]he Government . . . stated at the change-of-plea hearing

that no plea agreement was ever offered." (Doc. 5 at 3). Smith, however, is a savvy individual who admittedly engaged in a complicated fraud scheme. Yet he argues that he did not understand the magistrate judge's question, did not remember having received a plea agreement, or was confused about whether he had received a plea agreement from the United States. Even so, Smith had the opportunity to express these concerns and ask any questions in response to the magistrate judge's question, and he did not. He also could have raised them—and expressed his desire for a plea agreement—when the magistrate judge asked if he wished to go forward without a plea agreement and whether he was entering his guilty plea freely and voluntarily, but he did not. Smith's claims are belied by the record of his email exchanges and phone conversations with Felman.

Felman emailed Smith a copy of the proposed, unexecuted plea agreement on August 20, 2014. (*See* Doc. 12, Attachment 2 at 27). The agreement's plain language provided for Smith pleading guilty to Count One of the indictment, which carried a maximum statutory sentence of 20 years, and that if he accepted the plea agreement, the United States would not charge him with any other federal criminal offense related to the conduct giving rise to the plea agreement. Felman states in his affidavit that he "spoke to Mr. Smith on the telephone the same day that [he] sent him the plea agreement" [August 20, 2014] and "explained the proposed agreement to Mr. Smith, and particularly that it contained a 20-year 'cap' on any sentence of imprisonment even if the range of imprisonment under the Sentencing Guidelines range exceeded 20 years." (Doc. 17, Attachment 1 ¶ 7). He also provides a copy of a billing record

10

showing a "teleconference with client" on that date. (*See id.* at Attachment 3). Smith provides no contradictory affidavit or records. (*See* Doc. 18).

Smith reviewed the proposed agreement and responded to Felman about it the next day, August 21, 2014, expressing his dissatisfaction, but stated that Felman need not respond. (*Id.*). His email's subject line was "Re: Proposed Plea Agreement," and in it, he stated:

> I realize you have a busy day, so please do not feel that you need to respond.
>
> I am struggling with where we landed on the plea deal. I gave all that I could to include doing the work for the Government and paying for it on the forensic accounting. I think you did everything humanly possible. In return, we receive a plea deal that offers very little.
>
> Although Tom and Bob may consider this, I doubt it will be much, as they have all the leverage.
>
> If I go with the court appointed attorney or public defender and force them to indict me, can I pursue a trial? Would the track of going to trial give me discovery which buys more time, allows us to see exactly what they have, and actually makes them have to work. Does it offer more time. I assume I can always still plea at the end[,] and could it get worse than where we are now? Does the prospect of having to go to trial motivate them for a better deal? If not, do we have much to lose?

(Doc. 12, Attachment 2 at 27). Nowhere did Smith state that he did not understand the terms of the plea agreement, nor is any lack of understanding evident from his email. He did not pose any questions about the terms of the United States' offer or ask Felman to discuss the agreement with him. He never stated that he wanted to accept the deal or try to re-negotiate with the United States.

Still, Felman replied to the email that he would phone Smith that day. (*Id.*). Felman states in his affidavit that he phoned Smith and "again discussed the terms of

the proposed plea agreement with Mr. Smith, and answered any questions he had for me about it." (Doc. 17, Attachment 1 ¶ 9). He also provides a copy of a billing invoice showing a "teleconference with client" on August 21, 2014. (*See id.* at Attachment 3). Felman states that Smith "ultimately decided not to accept the plea offer." (Doc. 17, Attachment 1, ¶ 9). Again, Smith provides no affidavit or records to the contrary. (*See* Doc. 18).

"Ordinarily, contested factual issues in a section 2255 proceeding may not be determined based only on affidavits." *Alvarez-Sanchez v. United States*, 350 F. App'x 421, 423 (11th Cir. 2009). However, "[w]here the affidavits are supported by other evidence in the record, the court may rely upon them." *Owens v. United States*, 551 F.2d 1053, 1054 (5th Cir. 1977).[3] Smith has not provided an affidavit. Felman's statements that he spoke with Smith about the proffered plea agreement are corroborated by other evidence in the record—the emails and the invoice—in addition to his affidavit.

Felman met his duty to communicate a formal plea offer from the United States on terms and conditions favorable to Smith. *Frye*, 132 S. Ct. at 1408; *see also Duckworth*, 793 F.2d at 902. He also met his obligation to advise Smith of the advantages and disadvantages of the plea agreement. *Padilla*, 559 U.S. at 370. He only needed to provide Smith with an understanding of the law in relation to the facts, so that he could make an informed and conscious choice between accepting the United States' offer

---

[3]  Decisions handed down by the former Fifth Circuit before September 30, 1981 are binding in the Eleventh Circuit. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

and going to trial. *Wofford*, 748 F.2d at 1508; *Downs–Morgan*, 765 F.2d at 1539. He did just that. After Felman stopped representing Smith, Smith emailed him and, among other things, thanked him for all he did and said he was a good man. (Doc. 17, Attachment 2, at 30). Again, he mentioned nothing about the plea agreement Felman had emailed him, and did not say that he had wanted to discuss it with Felman, but they never did. (*See id.*).

It is clear from the record that Smith reviewed the agreement and did not find it favorable to him, given that his father and other co-conspirators entered into plea agreements with a five-year statutory maximum. So, Smith decided, as he had contemplated in his email to Felman, to "force [the United States] to indict" him and "buy[ ] more time" through the discovery process. (Doc. 12, Attachment 2 at 27). Now, Smith has buyer's remorse. Despite stating that Felman did "everything humanly possible," Smith incorrectly hoped that he could leverage a better deal by rebuffing the United States' offer. (*Id.* (". . . I can always still plea at the end, and could it get worse than where we are now? Does the prospect of having to go to trial motivate them for a better deal? If not, do we have much to lose?"). Smith took a gamble and lost. Once Smith rejected the plea agreement offer, the United States did not engage in further negotiations, and the grand jury indicted Smith on the two charges.

Smith's claim of ineffective assistance of counsel is founded on his self-serving assertion that, had he known of the offer of a plea agreement in 2014, he would have

accepted it.[4] *See Cook v. United States*, 189 F. App'x 927, 932 (11th Cir. 2006) (defendant's after-the-fact assertion, standing alone, insufficient to establish that defendant would have accepted plea); *Toro v. Fairman*, 940 F.2d 1065, 1068 (7th Cir. 1991) (and defendant's self-serving statement he "would have been insane" to reject a guilty plea if properly advised was by itself insufficient to establish prejudice). Smith challenges the applicability of these propositions from *Cook* and *Toro*, arguing that because the two cases involved allegations of "misadvice" by counsel, their holdings do not apply in the context of a claim based on an attorney's "failure to advise." But his challenge is misguided, and the propositions for which *Cook* and *Toro* were cited apply here. Felman advised Smith adequately, and Smith's self-serving after-the-fact assertions cannot alone establish prejudice, especially when they are conclusively refuted by the records of his email exchanges and phone conversations with Felman.

Finally, to the extent that Smith claims that his successor counsel, Tager, performed deficiently by failing to get another proposed plea agreement and by telling Smith that no plea agreement would be offered (after Smith had rejected the first one), this claim has no merit. The United States Supreme Court has long recognized that "there is no constitutional right to plea bargain; the prosecutor need not do so if he prefers to go to trial." *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977); *see also Frye*, 566

---

[4]   While Smith provides an affidavit from his father and co-defendant, Gary Truman Smith, contending that it corroborates his assertion, it does not. On this matter, his father merely states that it was his understanding in July 2014 that a plea agreement was being finalized, that Smith wished to enter a plea agreement to resolve the case, and that he was perplexed when he later learned that the United States would not offer a plea agreement. (*See* Doc. 1 at 40 –41).

U.S. at 148. By the time Tager was appointed to represent Smith, nearly three years had passed since Felman relayed to Smith the United States' proposed plea agreement, and Smith had now been indicted on the two charges. During that time, the United States brought the case before a grand jury and prepared it for trial. It did not have to continue negotiating with Smith. Smith's choices at that point were to enter an open guilty plea or go to trial. The United States' decision to stop any further plea negotiations establishes no failure of Smith's successor counsel or that Smith's rights were somehow violated. Ground One is denied.

### Ground Two: Involuntary Plea

Although Smith titles Ground Two as a claim for an unknowing, unintelligent, and involuntary plea, the claim is based on the allegations raised in Ground One. He asserts he was not advised of the option to enter a plea agreement rather than enter an open guilty plea. Smith adds that he had no reason to believe a favorable plea agreement had ever been offered. He also states it was not until after the direct appeal began that he realized the existence of the plea agreement that his counsel had never discussed with him. Ground Two fails for the same reasons discussed in denying Smith's ineffective assistance of counsel claim in Ground One.

To the extent that Smith raises a stand-alone claim for involuntary plea, the claim is procedurally defaulted because he did not raise it on direct appeal. A defendant must assert an available challenge on direct appeal or be barred from raising it in a section 2255 proceeding. *Massaro v. United States*, 538 U.S. 500, 504 (2003). Procedural default can be overcome only "(1) for cause and prejudice or (2) for a

miscarriage of justice, or actual innocence." *McKay v. United States*, 657 F.3d 1190, 1196 (11th Cir. 2011). Smith's claim was reasonably available at the time of his conviction, so he cannot show cause for his failure to raise the issue on direct appeal.

Although Smith states that it was not until after his direct appeal began that he realized the existence of the plea agreement that his counsel had never discussed with him, he makes no mention of how it came to his attention, but the record nonetheless belies his assertion. Smith received a copy of the only agreement ever proffered by the USA in August 2014, and emails about it were exchanged, and Felman had phone conversations with him about it. Additionally, even assuming Smith realized the existence of the plea agreement after his direct appeal began, but before it concluded, he could have sought to present the issue to the Eleventh Circuit in his appellate case. Therefore, Smith can only overcome the procedural default by showing a fundamental miscarriage of justice, or actual innocence. *See Bousley v. United States*, 523 U.S. 614, 622–23 (1998). "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Id.* at 623. Smith does not contend that he is factually innocent of his offenses of conviction.

Further, Smith cannot show that his plea was unknowing and involuntary. His statements at the plea hearing "constitute a formidable barrier in any subsequent collateral proceedings" because "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977); *see also United States v. Medlock*, 12 F.3d 185, 187 (11th Cir. 1994) ("There is a strong presumption that the statements made during the [plea] colloquy are true."). "[T]he subsequent presentation

16

of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." *Blackledge*, 431 U.S. at 74. With the warnings and explanations given in mind, Smith confirmed for the magistrate judge that he still wished to plead guilty. (Cr.-Doc. 63 at 37). The magistrate judge conducted the required colloquy during the open plea hearing and determined that Smith was entering his open guilty plea freely, knowingly, and voluntarily, understood the charges, penalties, and the consequences of pleading guilty, and that there was a factual basis for the guilty plea. (Cr-Doc. 63 at 28–30, 37, Cr-Doc. 61). Ground Two is denied.

## IV.    Conclusion

Smith's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255 (Doc. 1) is **DENIED**. The Clerk is directed to enter judgment against Smith, to close this case, and to enter a copy of this order in the criminal action, 8:16-cr-120-CEH-TGW.

Smith is not entitled to a certificate of appealability. To obtain a certificate of appealability, the petitioner must show that reasonable jurists would find debatable both (1) the merits of the underlying claims and (2) the procedural issues he seeks to raise. *See* 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 478 (2000); *Eagle v. Linehan*, 279 F.3d 926, 935 (11th Cir. 2001). Because Smith fails to show that reasonable jurists would debate either the merits of the claims or the procedural issues,

he is not entitled to a certificate of appealability or to appeal *in forma pauperis*.

**DONE AND ORDERED** in Tampa, Florida, this 27th day of August, 2025.

Charlene Edwards Honeywell
United States District Judge

***Copies to:***
*Pro se* Petitioner
Counsel of Record

18